UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

MARK ANTHONY PLAISANCE                    CIVIL ACTION NO. 6:18-cv-00033

VERSUS                                    JUDGE JAMES

U.S. COMMISSIONER,                        MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be reversed and benefits awarded.

## Administrative Proceedings

Three rulings have been issued, denying the claimant, Mark Anthony Plaisance's applications for Social Security disability benefits and supplemental security income benefits. On June 21, 2012, ALJ Michael M. Wahlder issued a ruling[1] in which he found that Mr. Plaisance's hypertension was severe but his mental health impairment was not severe. After Mr. Plaisance appealed the ruling, this Court determined that this finding (a) was not supported by substantial evidence

---

[1]     Rec. Doc. 12-2 at 580-588.

in the record, (b) precluded an evaluation of whether Mr. Plaisance's bipolar condition medically equaled a listing, either on its own or in combination with his other severe impairment, hypertension, and (c) resulted in a residual functional capacity assessment that failed to consider the effects of Mr. Plaisance's mental impairment on his ability to work.[2]  The matter was remanded for further administrative proceedings with specific instructions for the Commissioner to obtain updated records from the medical professionals treating Mr. Plaisance's bipolar disorder; order either an updated consultative examination or an evaluation by his treating physician with regard to his residual functional capacity in light of his mental impairment; determine whether his severe impairments meet or equal a listing, singly or in combination; and determine whether Mr. Plaisance retains the residual functional capacity to perform any type of work.[3]

On December 17, 2015, ALJ Mary Gattuso issued a ruling in which she found that Mr. Plaisance had four severe impairments – diabetes mellitus, obesity, hypertensive vascular disease, and bipolar condition – but retained the functional capacity to perform light work with restrictions and consequently was not disabled.[4]

---

[2]      Rec. Doc. 12-2 at 1-23.

[3]      Rec. Doc. 12-2 at 598.

[4]      Rec. Doc. 12-2 at 492-505.

The Commissioner moved for the ALJ's decision to be reversed and remanded.[5] Although the motion did not state any specific reasons why the Commissioner sought to have the decision remanded, an "Order of Appeals Council Remanding Case to Administrative Law Judge,"[6] dated January 27, 2017, explained that the district judge's order to either obtain an updated consultative examination or an evaluation by the claimant's treating physician had been ignored, necessitating further development of the record. Deviation from the court's remand order in the subsequent administrative proceeding is itself legal error, subject to reversal on further judicial review.[7]

Following the second remand, Administrative Law Judge Kim A. Fields issued a ruling on November 15, 2017, which again found that Mr. Plaisance was not disabled.[8] It is Judge Fields's ruling that is now being appealed.

Mr. Plaisance fully exhausted his administrative remedies before filing this action in federal court. In November 2010, he filed applications for disability

---

[5]    Rec. Doc. 12-3 at 715-718

[6]    Rec. Doc. 12-3 at 721-722.

[7]    *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989), citing *Hooper v. Heckler*, 752 F.2d 83, 88 (4th Cir. 1985) and *Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967). See, also, *Johnson v. Barnhart*, 285 F.Supp.2d 899, 916 (S.D. Tex. 2003).

[8]    Rec. Doc. 12-3 at 559-571.

insurance benefits ("DIB") and supplemental security income benefits ("SSI").[9]  He alleged disability beginning on October 15, 2006 but subsequently worked at levels above substantial gainful activity ("SGA"); therefore, his alleged disability onset date was adjusted to April 21, 2009.[10]  His applications were denied.[11]  Mr. Plaisance then requested a hearing, which was held on February 28, 2012.[12]  Following remand, a second hearing was held on October 14, 2015 before ALJ Mary Gattuso.[13]  Following the second remand, a hearing was held on July 12, 2017 before ALJ Fields.[14]

The claimant is currently appealing the ALJ's November 2017 decision that concluded that he was not disabled within the meaning of the Social Security Act from October 15, 2006 through the date of the decision.[15]  That ruling was issued after the court remanded the matter for further consideration.  There is no evidence in the record that the Appeals Council assumed jurisdiction of the case after the ruling was issued or that the claimant asked the Appeals Council for review of the

---

[9]    Rec. Doc. 12-1 at 121, 123.

[10]    Rec. Doc. 12-1 at 169.

[11]    Rec. Doc. 12-1 at 87, 88.

[12]    A transcript of the hearing is found in the record at Rec. Doc. 12-1 at 58-71.

[13]    A transcript of the hearing is found in the record at Rec. Doc. 12-2 at 511-575.

[14]    A transcript of the hearing is found in the record at Rec. Doc. 12-3 at 578-605.

[15]    Rec. Doc. 12-3 at 570-571.

ALJ's November 15, 2017 decision.  Therefore, the ALJ Fields's decision became the final decision of the Commissioner for the purpose of judicial review.[16]  The claimant then initiated this action, seeking judicial review of the Commissioner's decision.

### Summary of Pertinent Facts

The claimant, Mark Anthony Plaisance, was born on October 31, 1967.[17]  At the time of the first ALJ's decision, he was forty-four years old; at the time of the second ALJ's decision, he was forty-eight years old; and at the time of the third ALJ's decision, he was fifty years old.  He is now approaching his fifty-second birthday.  Mr. Plaisance graduated from high school[18] and worked most recently doing day labor for a temporary service and as a restaurant dishwasher.[19]  He previously worked as a delivery driver and in the oilfield.[20]  He alleged in his applications that he has been disabled since October 15, 2006[21] due to high blood pressure, hernia, and a bipolar condition.[22]

---

[16]    20 C.F.R. § 404.984(d).

[17]    Rec. Doc. 12-3 at 581.

[18]    Rec. Doc. 12-2 at 525; Rec. Doc. 12-3 at 581.

[19]    Rec. Doc. 12-3 at 10.

[20]    Rec. Doc. 12-3 at 582, 599.

[21]    Rec. Doc. 12-1 at 123.

[22]    Rec. Doc. 12-1 at 73.

There are no treatment notes or other types of medical evidence in the record coordinating with Mr. Plaisance's alleged disability onset date in 2006 or with his alleged workplace accident in that time frame.  The record does, however, contain medical records from University Medical Center ("UMC")[23] in Lafayette, Louisiana, where Mr. Plaisance sought primary treatment for his physical ailments and occasionally sought treatment for his mental impairments between 2003 and 2015. It also contains documentation from the Dr. Joseph Henry Tyler, Jr. Behavioral Health Clinic ("Tyler Clinic")[24] in Lafayette, Louisiana, regarding Mr. Plaisance's treatment for mental health conditions from 2011 to 2017.

On January 11, 2008, Mr. Plaisance presented at UMC's emergency room ("ER"), complaining about abdominal pain and vomiting but also requesting psychiatric treatment for his bipolar disorder.[25]  He was referred to the Tyler Clinic for mental health treatment.[26]

---

[23]     At some point, UMC's name was changed to University Hospital & Clinics ("UHC").  For the sake of simplicity, however, "UMC" will be used throughout this report when referring to this facility.

[24]     The Tyler Clinic's records are sometimes titled "Magellan DCC."  For simplicity, this report will refer only to the Tyler Clinic.

[25]     Rec. Doc. 12-2 at 333, 336.

[26]     Rec. Doc. 12-2 at 338.

He returned to UMC's ER a year later, on February 11, 2009,[27] complaining of low back pain and suggesting that he might have pulled a muscle while lifting things at work.  He also requested medication for his bipolar disorder and depression.  X-rays of his low back were negative except for mild spurring.  He was given injections of Depomedrol and Toradol and released.

On August 25, 2010,[28] the claimant returned to the ER at UMC, complaining of abdominal pain and vomiting that had lasted for three weeks.  A CT scan of his abdomen and pelvis revealed no acute findings.  A ventral wall hernia was detected, and the claimant was referred to UMC's general surgery department.

Mr. Plaisance returned to the emergency department at UMC on September 22, 2010 with similar complaints.[29]  He gave a history including hypertension and bipolar disorder.  Diagnostic testing was negative.  He returned to UMC on September 28, 2010[30] for an esophagogastroduodenoscopy procedure to evaluate his complaint that he had been vomiting daily for about three months.

---

[27]     Rec.Doc. 12-2 at 324-331.

[28]     Rec. Doc. 12-2 at 264-280.

[29]     Rec. Doc. 12-2 at 248-268, 281-287.

[30]     Rec. Doc. 12-1 at 254; Rec. Doc. 12-2 at 193, 206, 208, 260.

Mr. Plaisance presented at the UMC ER on October 13, 2010,[31] complaining of dizziness, weakness, abdominal pain, and vomiting every morning.  He gave a history including bipolar disorder.  Diagnostic testing was performed, he was referred to UMC's internal medicine department, and Nexium was prescribed.  On October 18, 2010 and October 19, 2010, Mr. Plaisance sought to fill a Tramadol prescription, which had been prescribed by the ER doctor.[32]

Mr. Plaisance returned to the ER at UMC on October 27, 2010,[33] complaining of stomach and back pain and requesting refills of Tramadol.  He also requested a referral for his bipolar disorder.  He was prescribed Ultram and Nexium, an appointment was made for a GI scope, and he was advised not to eat spicy food.

On    November    5,    2010,[34]    Mr.    Plaisance    underwent    an esophagogastroduodenoscopy procedure with biopsies and testing for H. Pylori bacteria.  Mild gastritis was detected.  He was advised to stop smoking and return for a follow-up visit.

---

[31]    Rec. Doc. 12-1 at 371, 372, 379-391.

[32]    Rec. Doc. 12-1 at 256, 259.

[33]    Rec. Doc. 12-2 at 220-229.

[34]    Rec. Doc. 12-2 at 191-215.

Mr. Plaisance followed up in UMC's surgical department on November 23, 2010.[35]  He reported that his pain had improved since taking Nexium.  He was scheduled to have his umbilical hernia repaired surgically on December 20, 2010.  A presurgical workup was conducted on December 16, 2010,[36] and it was noted that Mr. Plaisance was scheduled to be seen at the Tyler Clinic.  Mr. Plaisance's umbilical hernia was repaired by Dr. Kelly Johnson at UMC on December 20, 2010.[37]  While the primary diagnosis was umbilical hernia, the secondary diagnoses assigned were essential hypertension, bipolar disorder, tobacco use disorder, personal history of noncompliance with medical treatment, and unspecified gastritis and gastroduodenitis without mention of hemorrhage, and Mr. Plaisance stated that he experienced both manic and depressive episodes.  Mr. Plaisance returned to the surgery clinic on January 11, 2011 for a follow-up visit with regard to his hernia operation.[38]  He was doing well, and his incision was healing well with no drainage and no pain.

---

[35]    Rec. Doc. 12-2 at 186-190.

[36]    Rec. Doc. 12-2 at 177-185.

[37]    Rec. Doc. 12-1 at 234-349.

[38]    Rec. Doc. 12-2 at 171-174.

Mr. Plaisance was seen at UMC's internal medicine clinic on February 22, 2011.[39]  He reported having been dizzy recently, and he requested that his blood sugar be checked.

On March 1, 2011, the claimant was examined by clinical psychologist Alfred E. Buxton at the request of Disability Determination Services.[40]  Dr. Buxton did not review any medical records in connection with his evaluation of Mr. Plaisance.  Mr. Plaisance told Dr. Buxton that he had gastroesophageal reflux disease, occasional low back pain secondary to a work place accident "years ago," and chronic bilateral leg pain that has been present since childhood.  Mr. Plaisance reported that he had a psychiatric hospitalization "years ago" and had been diagnosed with bipolar disorder.  He reported that his brother also has bipolar disorder.  Dr. Buxton found that Mr. Plaisance's language skills were good, his social skills were good, his recent and remote memories were intact, his ability to attend and concentrate was good, his pace was even, his intellect was normal, his judgment was good, his reasoning and insight were fair, his cognition was clear and cogent, his mood was mildly dysphoric, and his affect was mood congruent.  Mr. Plaisance reported having had auditory and visual hallucinations approximately ten years earlier.  He also reported a chronic mistrust of others.  He had occasional dizziness, blurred vision, and shortness of

---

[39]    Rec. Doc. 12-1 at 230-231.

[40]    Rec. Doc. 12-1 at 357, 359-360.

breath.   He stated that he had indigestion or heartburn that was relieved with medication.  He described himself as a chronic worrier, said that he is easily upset and tends to fuss, and has frequent dysphoria with occasional crying spells.  He noted that he tends to be obsessed with order and structure and has social anxiety.  Dr. Buxton diagnosed Bipolar II Disorder with mild to moderate impairment and a fair prognosis as well as alcohol dependence although abstinent for the past year, and complaints of chronic pain.  Dr. Buxton opined that outpatient mental health intervention with medication and counseling would be appropriate, and he noted that Mr. Plaisance had an appointment scheduled at the Tyler Clinic the next day.  He assigned a GAF score of 60 over the past twelve months.  His ultimate opinion was that "[w]ith adequate motivation then at a minimally adequate level he should be able to perform in a reliable and dependable fashion as an employee. . . [and] should be able to tolerate the frustration and stress he would encounter in the job setting."

On March 3, 2011, Mr. Plaisance was evaluated at the Tyler Clinic by Dr. George W. Diggs, Jr., a psychiatrist.[41]  Mr. Plaisance explained that he had been hospitalized for treatment for a bipolar disorder more than ten years earlier but had not taken any medication for his mental impairments for almost ten years.  He stated that he was depressed, anxious, had mood swings, isolated himself due to irritability

---

[41]        Rec. Doc. 12-2 at 475-483.

and paranoia, became angry when corrected, and worried.  He complained of poor sleep, poor concentration, poor energy, and an inability to experience pleasure.  He stated that, in the past, he had experienced periods of increased energy, impulsive actions, and a decreased need for sleep.  He admitted that he sees people that he knows have passed away.  He admitted to past alcohol abuse and two DWIs, but claimed to be sober.  Dr. Diggs found that the claimant's affect was constricted and intense; his mood was depressed, anxious, and angry; his thought process was slow, his speech was monotonous; and his thought content contained persecutory delusions.  He experienced auditory and visual hallucinations.  His intelligence was borderline.  His insight and judgment were impaired, and he was incapable of abstractions.  In Dr. Diggs's opinion, Mr. Plaisance had decreased energy, slowed thoughts, impaired cognition, and history of bipolar affective disorder.  He diagnosed bipolar affective disorder with psychosis and alcohol abuse in remission and prescribed Paxil and Risperdal.  Dr. Diggs assigned a GAF score of 35.[42]  On

---

[42]     The GAF scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.  A GAF score in the 31 to 40 range indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thing, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work. . . ."  The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice."  American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013).  However, GAF scores continue to be considered evidence.  "We consider a GAF rating as opinion evidence.  As with other opinion evidence, the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental

March 17, 2011, Dr. Diggs developed a treatment plan for Mr. Plaisance,[43] and Mr. Plaisance met with therapist Robert Landreneau for counseling.[44]   He described visual hallucinations in which people on the street take on the facial features of his deceased relatives.

When Mr. Plaisance met with Dr. Diggs on April 5, 2011, he admitted to continued anxiety and hallucinations.   Dr. Diggs discontinued the Paxil and Risperdal and prescribed Seroquel and Buspar.   When he returned to see Mr. Landreneau on May 5, 2011,[45] his sleep had improved since the medication change but he continued to feel nervous and depressed.   He saw Mr. Landreneau again on June 13, 2011 and July 5, 2011.[46]   He had gained weight as a side effect of his medication, was less depressed, but was still anxious.

On August 4, 2011, Mr. Plaisance met with licensed clinical social worker Michelle Maloney at the Tyler Clinic.[47]   He exhibited little range of emotion,

---

functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." *Jackson v. Colvin*, No. 4:14-CV-756-A, 2015 WL 7681262, at *8 (N.D. Tex. Nov. 5, 2015) (citing Administrative Message 13066 attached as an exhibit to the opinion), report and recommendation adopted, 2015 WL 7582339 (N.D. Tex. Nov. 25, 2015).

[43]      Rec. Doc. 12-2 at 457-458.

[44]      Rec. Doc. 12-2 at 474.

[45]      Rec. Doc. 12-2 at 472.

[46]      Rec. Doc. 12-2 at 470, 471.

[47]      Rec. Doc. 12-2 at 469.

reported improved depression but continued anxiety, increased weight gain, and little social contact other than with his mother and brother.

The claimant met with Dr. Diggs again on August 30, 2011.[48]  He reported that he was tired all the time, had decreased energy during the day, and was able to sleep all day.  His affect was depressed and flat.  His depression had improved but his anxiety was unchanged.  Dr. Diggs was concerned about the claimant's weight gain and considered changing medications.

On September 21, 2011, the claimant met with Ms. Maloney again.  His mood was low, and he responded to questions with no spontaneity or elaboration.  He reported that he could not think straight and stated that he sometimes heard voices in his head.  He described problems with his feet and legs as well as bad headaches. He stated that he and his brother argued with their mother daily.  He reported a fifty pound weight gain that he attributed at least in part to his medications.

On that same day,[49] the claimant presented at the ER at UMC, complaining of pain in his right foot and leg for the past two to three months.  Examination showed swelling of both ankles and painful ankle joints.  The claimant gave a history of acid reflux and bipolar disorder.  He reported that he had stopped taking medication for hypertension "years ago."  The doctor's impressions were hypertension and chronic

---

[48]     Rec. Doc. 12-2 at 468.

[49]     Rec. Doc. 12-2 at 151-165.

bilateral lower extremity pain. The claimant was instructed to increase his consumption of potassium-rich foods and to keep a daily record of his blood pressure. He was referred to the internal medicine clinic for follow-up.

The claimant met with Dr. Diggs on September 30, 2011.[50] Since his last visit to the Tyler Clinic, he had been placed on blood pressure medication Lisinopril and Naproxyn. He admitted to anxiety, occasionally hearing voices, and anxiety associated with tremors. His affect was depressed. Dr. Diggs continued the Buspar and Seroquel and counseled the claimant on diet and exercise.

Mr. Plaisance met with Dr. Diggs again on October 28, 2011.[51] He reported anxiety and upset stomach, vomiting, and headaches as well as occasional voices and anxiety associated with tremors. However, he was sleeping well. He had lost weight. Paxil was added to his prescriptions, and Naproxyn was discontinued due to gastrointestinal side effects.

The claimant met with Ms. Maloney at the Tyler Clinic on November 22, 2011.[52] She noted that he had the same anxious and intense facial expression as at previous meetings but Mr. Plaisance reported that his new medication was helping with his nerves. He stated that he had more patience and less verbal conflict with

---

[50]    Rec. Doc. 12-2 at 466.

[51]    Rec. Doc. 12-2 at 465.

[52]    Rec. Doc. 12-2 at 464.

his brother.  He was working to lose weight, sleeping well, and rated his depression and anxiety at four on a ten-point scale.

On December 5, 2011,[53] Mr. Plaisance was taken to the emergency room at UMC by ambulance.  His mother had called the police after he had been gone from home for three days then returned agitated and "talking out of his head."  Garbled speech was noted.  Illicit drug abuse was suspected, but the claimant denied any substance abuse.  He had told the ambulance crew that he was nervous, in pain all over, and pregnant.

Three days later, on December 8, 2011, Mr. Plaisance was seen in the internal medicine clinic at UMC.[54]  He reported having had a sharp pain in the back of his head the previous night, which had resolved.  He also reported a "knot" in his upper abdomen when he coughed.  The treatment note indicated that he was being followed at the Tyler Clinic for his bipolar disorder.

Two days after that,[55] the claimant again presented at the UMC emergency room, complaining about vomiting and diarrhea.  He gave a history of bipolar disorder and heartburn.  He associated his vomiting with taking Flonase.  He was diagnosed with allergic rhinitis and advised to take Claritin in place of Flonase.

---

[53]     Rec. Doc. 12-2 at 61-87.

[54]     Rec. Doc. 12-2 at 146-150.

[55]     Rec. Doc. 12-2 at 137-145.

Three days later, he was back in the ER at about 8:30 a.m., complaining about abdominal pain.[56]  The doctor suggested a work up to rule out gallstones and gastroesophageal reflux disease ("GERD").  The claimant returned to the ER that evening, again complaining of abdominal pain and stating that he could not wait for all the testing that had been proposed that morning.  He gave a psychiatric history of anxiety and depression.

Three days after that, on December 17, 2011,[57] he was back in the ER again, this time complaining about left-side, stabbing chest pain and light headedness as well as vomiting after taking his hypertension medication.  The pain subsided after he was given nitroglycerin and oxygen.  The treatment note indicated that multiple lab studies done three days earlier and five days earlier were within normal limits. He was advised to stop taking Naprosyn, to take Nexium daily, to keep his clinic appointment, and to see his bipolar doctor the next week.  He was given a prescription for Ultram.

On January 2, 2012,[58] Mr. Plaisance was back in the ER.  He complained of dizziness and weakness and stated that while sleeping he felt like his heart was going to stop beating.  He fell asleep during triage.

---

[56]    Rec. Doc. 12-2 at 38-60.

[57]    Rec. Doc. 12-2 at 25-37.

[58]    Rec. Doc. 12-2 at 126-136.

Mr. Plaisance returned to the ER again on January 17, 2012.[59] He complained of both feet gradually swelling over the past month, accompanied by pain, which was exacerbated by movement and walking and relieved by nothing. He reported difficulty walking. Examination revealed pedal edema in both lower extremities. He was prescribed Lasik, Hetz, and K-Dur 20. He was also referred to UMC's internal medicine clinic. An ultrasound examination of the claimant's abdomen on January 19, 2012 revealed fatty infiltration in the liver.[60]

On February 7, 2012,[61] the claimant followed up in the internal medicine clinic at UMC. He complained of back and abdominal pain and stated that he was off all of his medications because he could not afford them. Much of the treatment note is illegible, but the doctor advised Mr. Plaisance to restart the medications he was prescribed for hypertension and GERD, and an echo test was scheduled in connection with his lower extremity edema.

On February 22, 2012, Mr. Plaisance met with Ms. Maloney at the Tyler Clinic.[62] Despite his usual negative and intense facial expression, Mr. Plaisance reported that he was "fine" and that the medications were working. He reported that

---

[59]     Rec. Doc. 12-2 at 113-125.

[60]     Rec. Doc. 12-1 at 88.

[61]     Rec. Doc. 12-2 at 19-20, 89, 98-103.

[62]     Rec. Doc. 12-1 at 38.

he still had conflict with his brother, including recently slapping him to make him "shut up."  He denied visual hallucinations, had no complaints of depression or anxiety, stated that he was sleeping well, and denied using alcohol or drugs.

On February 27, 2012,[63] Mr. Plaisance was seen in the emergency room at UMC for a rash on his torso.  He stated that the rash appeared when he started taking Lisinopril.  Lab work was done, and he was given an injection of Solumedrol.  He was advised to stop taking Lisiniprol and HCTZ, to increase his fluid intake, and to take his medications as directed.

On February 28, 2012, the claimant testified at a hearing regarding his symptoms and his medical treatment.[64]  He explained that he had last worked for a service providing temporary labor and had left that work because he could not tolerate the heat.  He also reported being tired all the time and having pain in his back and legs.  He attributed his back pain to a work place injury that occurred about fifteen years earlier.  He stated that he had not had back surgery but continued to be treated for back pain at UMC.  He also stated that his work for the temporary service worsened his back pain.  He testified that his bipolar condition was disabling.  No testimony was obtained from a vocational expert.  During the hearing, the ALJ was confrontational and stated that the consultative psychologist Dr. Alfred Buxton "says

---

[63]     Rec. Doc. 12-2 at 104-112.

[64]     Rec. Doc. 12-3 at 676-690.

that you're perfectly okay" and "finds there's absolutely nothing wrong with you." As explained in this Court's report and recommendation dated August 12, 2014, the ALJ's comments misrepresented Dr. Buxton's findings.[65]

On March 15, 2012,[66] Mr. Plaisance was notified that laboratory tests at the Tyler Clinic were abnormal in that his blood sugar level was elevated, his total cholesterol level was elevated, and his LDL cholesterol level was elevated.  He was advised to discuss this with his primary care physician.

On March 27, 2012,[67] Dr. Diggs at the Tyler Clinic reviewed Mr. Plaisance's progress and noted that he denied any hallucinations but admitted to persecutory delusions such as people he went to school with not wanting to have anything to do with him.  His medications were continued.

On May 9, 2012, Mr. Plaisance met with the social worker, Ms. Maloney, again.[68]  His expression was tense and confused looking.  He reported that he was irritable and short tempered with his brother who has cognitive and developmental delays.  He appeared depressed and rated his anger at a seven on a ten-point scale.  Ms. Maloney noted that he is likely on the lower end of average functioning in

---

[65]     Rec. Doc. 12-2 at 618-619.

[66]     Rec. Doc. 12-2 at 484.

[67]     Rec. Doc. 12-1 at 37.

[68]     Rec. Doc. 12-1 at 36.

cognition and social skills.  He complained that his mother handles everything now and his wife did so when he was married.  He reported few independent activities. He was to return in two months.

Mr. Plaisance returned to the internal medicine clinic at UMC on May 15, 2012[69] to follow up with regard to his physical conditions.  It was noted that the echocardiogram of February 12 showed a normal ejection fraction, his GERD was stable with over-the-counter Prilosec, and his bipolar condition was being followed at the Tyler Clinic.  The note regarding his hypertension is illegible.

On July 5, 2012, the claimant again met with Ms. Maloney at the Tyler Clinic.[70]  His affect was restricted and he appeared depressed.  He reported no change and said that he continued to do little with his time.  He rated his depression at a seven and his anxiety a five.  He denied hallucinations, alcohol use, and anger outbursts.  He also reported a recent episode of feeling faint.  Ms. Maloney recommended that he discuss this with his primary care physician.

The claimant saw Dr. Diggs again on August 1, 2012.[71]  He reported having good days and bad days and rated his depression at six, his anxiety at five, and his anger at three to four.  He complained about pounding headaches that he believed

---

[69]     Rec. Doc. 12-2 438-442.

[70]     Rec. Doc. 12-1 at 35.

[71]     Rec. Doc. 12-1 at 33-34.

were caused by his medications as well as about a period of weakness, dizziness, and visual loss that resolved after several hours. In Dr. Diggs's opinion, the side effects of the claimant's medication did not significantly interfere with his functionality. He found that the claimant had a dysphoric depressed mood, appropriate affect, logical thought processes, nonpsychotic thought content, intact memory, and fair concentration, intellect, insight, and judgment. He rated the severity of Mr. Plaisance's symptoms as moderate, noted that he was much improved, but assigned a GAF score of 53.

The claimant was then seen at UMC's internal medicine clinic on September 25, 2012.[72] He had been diagnosed with hypertension, GERD, bipolar disorder, and high cholesterol. It was noted that he was being treated at the Tyler Clinic.

On September 26, 2012, Mr. Plaisance saw both Dr. Diggs and Ms. Maloney, the social worker, again.[73] He told Dr. Diggs that he was feeling better than at the previous appointment. He denied hallucinations and rated his depression at seven and his anxiety at five. Dr. Diggs noted that his affect was appropriate, his mood was anxious, dysphoric, and depressed, his thought content was nonpsychotic, his concentration was fair, his memory was intact, and his intellect, insight, and judgment were all good. Dr. Diggs rated the severity of his symptoms as moderate

---

[72]    Rec. Doc. 12-2 at 428-437.

[73]    Rec. Doc. 12-2 at 541-543.

and noted minimal overall improvement.  The plan was to continue Paxil, Buspar, and Seroquel, and Dr. Diggs recommended diet and exercise to combat weight gain.  He assigned diagnoses of Bipolar I, recent depressed, severe, with psychosis and alcohol dependence.  He assigned a GAF score of 53.

Ms. Maloney noted that Mr. Plaisance appeared heavier, and he confirmed that he was still gaining weight.  His expression was tense and constricted.  He reported that he was "doing OK" but was still depressed.  He stated that he did not recall the last time he felt good.  He reported that he spent most of his time watching TV.  He reported abstaining from alcohol and fewer temper flares.  He denied hallucinations.  Ms. Maloney described him as isolated, depressed, and anhedonic.  He was to return in two months to see Dr. Diggs and in three months for counseling.

On December 19, 2012,[74] the claimant again saw social worker Maloney.  He appeared depressed and dysthymic and had a tense expression.  He was cooperative, calm, polite, and lacking in spontaneity.  He reported that his mood was "OK," he denied anger issues, and he reported getting along with his brother.  He was sleeping well but feeling tired.  He was continuing to gain weight.  He rated his depression at six on a ten-point scale and denied anxiety.  He stated that had had been enjoying

---

[74]      Rec. Doc. 12-3 at 540.

watching football on TV and was trying to be more active.  He denied hallucinations and alcohol use.

Mr. Plaisance saw Dr. Diggs again on February 18, 2013.[75]  He stated that he was doing better and denied side effects from his medication, depression, hallucinations, delusions, homicidal or suicidal ideation, or anxiety.  His mood was dysphoric, his affect was appropriate, his thought content was nonpsychotic, his concentration was fair, his memory was intact, and his intellect, insight, and judgment were all good.  Dr. Diggs opined that the severity of his symptoms was moderate, and he continued Seroquel, Buspar, and Paxil.  The diagnoses and GAF score remained the same.

On February 25, 2013,[76] Ms. Maloney evaluated Mr. Plaisance.  She noted that his chief complaints were depression, anxiety, past alcohol abuse and dependence, paranoia, and auditory and visual hallucinations.  She stated that he had been treating at the Tyler Clinic since October 2010 and had two past psychiatric hospitalizations.  He was taking Buspar, Paxil, and Seroquel as well as medications for acid reflux, hypertension, and high cholesterol.  She described his mother as Mr. Plaisance's caretaker as she prepared his meals, drove him in her car, and assisted him with activities of daily living.  However, he did some household chores.  His

---

[75]     Rec. Doc. 12-3 at 538-539.

[76]     Rec. Doc. 12-3 at 511-519.

24

recreational activities were watching TV and playing cards with family. She described him as lacking spontaneity. She noted that his behavior and psychomotor activity were normal, his attitude was compliant, his speech was impoverished, his mood was dysphoric, his affect was flat, he continued to have visual and auditory hallucinations, his thought process was logical and coherent but lethargic, his judgment was impaired, he had some insight into his illness and symptoms, and he was able to resist impulses. She assigned diagnoses of Bipolar I and alcohol dependence in remission and assigned a GAF score of 57 at the time and over the past year. She indicated that medication maintenance and individual therapy were both needed.

Mr. Plaisance saw Ms. Maloney again on March 13, 2013.[77] He had a flat affect and dysthymic mood, but no complaints. He stated that he was pleased to be having fewer hallucinations. Although he denied depression, he rated it a six on a ten-point scale. He stated that his general anxiety was unchanged. He stated that he enjoyed playing cards with his mother and brother and was doing some dishes while his mother did most household chores, including cooking and driving both sons. He reported that he had stopped working several years ago because he could not handle it due to anxiety and the voices he was hearing. Ms. Maloney noted that he displayed

---

[77]    Rec. Doc. 12-3 at 537.

a lack of expressed emotion and limited insight, but his condition was improved. He was to return in two months to see Dr. Diggs and in four months for counseling.

The claimant saw Dr. Diggs again on April 17, 2013.[78] Dr. Diggs noted that he was "doing well." He continued the Seroquel prescription. He described the severity of Mr. Plaisance's symptoms as moderate and opined that there had been no change with regard to global improvement. The diagnoses remained the same, and he again assigned a GAF score of 53. Mr. Plaisance was to return in four weeks.

Mr. Plaisance was seen again at UMC's internal medicine clinic on June 13, 2013.[79] He was prescribed medication for type II diabetes, he was prescribed Tramadol for low back pain, it was noted that his hypertension was controlled, and he was referred to the dermatology clinic for a specific complaint. He followed up in the dermatology clinic on July 11, 2013.[80] On August 24, 2013,[81] he was treated in the emergency room for a corneal abrasion.

On June 20, 2013, the claimant returned to see Dr. Diggs[82] and reported that he had been diagnosed with diabetes. He described seeing faces episodically that

---

[78]    Rec. Doc. 12-3 at 535-536.

[79]    Rec. Doc. 12-3 at 473-478.

[80]    Rec. Doc. 12-3 at 469-472.

[81]    Rec. Doc. 12-3 at 455-468.

[82]    Rec. Doc. 12-3 at 532-534.

made laughing sounds but did not scare him. Dr. Diggs advised the claimant to seek help if the faces told him to hurt himself or others. He also reported fewer temper flares accompanied by racing thoughts, rapid speech, and confusion. After conferring with another physician, Dr. Diggs continued the claimant's medications – Busipirone, Paroxetine, and Quetiapine – in light of the diabetes diagnosis. Dr. Diggs noted that the claimant was obese and disheveled, his mood was euthymic, his affect was appropriate, his speech was soft, his thought content was nonpsychotic, he was having auditory hallucinations, his concentration was good, his memory was intact, and his insight and judgment were good. In Dr. Diggs's opinion, there had been no change in his condition, and he rated the severity of his symptoms as moderate. The diagnoses remained the same, and the GAF score remained at 53.

The claimant's next appointment with Ms. Maloney, the social worker, was on July 3, 2013.[83] She observed that his affect and presentation were restricted, he appeared tense, and he displayed little to no spontaneity, which was not a change from previous visits. He reported that his mood was unchanged and that he engaged

---

[83]     Rec. Doc. 12-3 at 531.

in little activity.  She encouraged him to attend LARC[84] for variety, peer-to-peer support, social contact, activities, and psychoeducation.

Mr. Plaisance saw Dr. Diggs again on August 23, 2013.[85]  He reported that he was doing well but admitted some paranoia, stating that people fail to recognize when he is joking and that those who went to school with him do not want to have anything to do with him.  He denied hallucinations.  He displayed some thumb clinching motions and paranoia.  His medications were continued.  Dr. Diggs noted that Mr. Plaisance's hygiene was good, his affect was appropriate, his mood was dysphoric, his thought content contained paranoid delusions, he had auditory hallucinations, his concentration was fair, his memory was intact, and his intellect, insight, and judgment were good.  Again, Dr. Diggs rated the severity of his symptoms as moderate and noted no improvement in his overall condition.

Mr. Plaisance went to the emergency room at UMC on September 23, 2013,[86] complaining about left-side abdominal pain, nausea, vomiting, and bloody stool.  He gave a history of bipolar disorder and depression.  He was diagnosed with a rectal

---

[84]    LARC is a local nonprofit organization that provides services to people with developmental and intellectual disabilities.  LARC, Inc., www.lafayettelarc.org (last visited May 8, 2019).

[85]    Rec. Doc. 12-3 at 529-530.

[86]    Rec. Doc. 12-3 at 430-454.

bleed and bilateral pedal edema.  Tests were performed, he was prescribed Lasik and Prilosec, and he was referred to the GI clinic for further testing.

The claimant returned to the emergency room at UMC with left abdominal pain on October 2, 2013.[87]  It was noted that he had a history of hypertension, diabetes, and bipolar disorder.  Lab work, x-rays, and an abdominal ultrasound were ordered, and the claimant was given an injection of Bentyl.  The ultrasound showed an enlarged liver with fatty infiltration.  He was to follow up with the internal medicine clinic.  He did so on November 8, 2013 with regard to hypertension, diabetes, and fatty liver.[88]

Mr. Plaisance saw Dr. Diggs at the Tyler Clinic again on November 15, 2013.[89]  He reported sadness, conflict with his mother, anxiety, and periods of crying.  He also reported being easily rattled if pushed or rushed by others.  He had lost weight.  His medications were continued.  Dr. Diggs described his mood as anxious, dysphoric, and depressed; his affect was appropriate; his thought content contained paranoid delusions; he experienced auditory hallucinations, but his concentration was fair, his memory was intact, and his intellect, insight, and

---

[87]    Rec. Doc. 12-3 at 411-429.

[88]    Rec. Doc. 12-3 at 392-402.

[89]    Rec. Doc. 12-3 at 526-527.

judgment were good.  Again, Dr. Diggs rated the severity of his symptoms as moderate.  He also noted overall minimal improvement.

Mr. Plaisance met with Ms. Maloney on November 18, 2013.[90]  He reported eating less and exercising more, and his weight loss was visible.  Although he remained tense and depressive, Ms. Maloney noted an increase in spontaneous conversation.  He denied having hallucinations and expressed a desire to move out of his mother's house.  She noted that while his mood was still negative, his level of functioning seemed better.

The claimant was seen in the UMC emergency room on Christmas Day 2013[91] with a complaint that he had not been able to hear out of his right ear for three days.  He rated his aching, throbbing pain at ten out of ten.  He gave a history of diabetes, hypertension, GERD, and bipolar disorder.  He was diagnosed with otitis externa, medication was administered, and additional medications were prescribed.  He was to follow up with the ENT clinic.

Mr. Plaisance saw social worker Maloney again on February 6, 2014.[92]  He displayed his usual tense and intense expression and depressive mood.  He reported anger with people in his neighborhood, those he played cards with, his mother, and

---

[90]     Rec. Doc. 12-3 at 524.

[91]     Rec. Doc. 12-3 at 376-391.

[92]     Rec. Doc. 12-3 at 522.

his brother.  He reported having been to LARC to play cards and get out of the house but explained that he has transportation issues and complained that the staff there lost some of his papers.  Ms. Maloney described the claimant as generally depressed, mildly paranoid, and chronically irritable.

On March 14, 2014,[93] Mr. Plaisance was seen in the internal medicine clinic at UMC for continuing back pain, a check-up, and medication refills.  The physician's impressions included hypertension, diabetes, bipolar disorder, and low back pain.

Ms. Maloney again evaluated Mr. Plaisance on April 3, 2014.[94]  She noted that he displayed depression with irritability, anxiety, isolation.  She noted psychosis at times prior to treatment.  She stated that, despite his symptoms continuing, he had some episodes of reduced symptoms.  She noted that he stopped working in 2010 due to psychiatric symptoms.  She indicated that his functional impairment status was mild, that his basic needs were being met with the assistance of his mother, and that he was not interested in being around many people.  She described him as overweight, tense, depressive, anxious, and cautious.  She described his speech as normal, his mood as dysphoric and anxious, his affect as appropriate, and his thinking as slow.  She noted that he had displayed aggressive, defensive behavior in

---

[93]    Rec. Doc. 12-3 at 365-369.

[94]    Rec. Doc. 12-3 at 502-510.

the past.  She indicated that his concentration was impaired, although she did not formally test it or his memory.  She noted that his intellectual functioning was normal or average but his thinking and comprehension seemed slow.  She indicated that he had some awareness of his illness and symptoms, but his insight was impaired.  She noted that he was currently able to resist impulses.  There was no current risk of harm to himself or others, although he had fought with his brother in the past.  She diagnosed him with Bipolar I and alcohol dependency in remission.  She assigned a current GAF score of 55 with a highest GAF score of 57 over the past year.  The plan for future services was medication management and individual therapy.

On May 6, 2014, the claimant saw psychologist Dr. Glenn Ally at the Tyler Clinic for the first time.[95]  Dr. Ally noted that this was a "wellness visit," and the claimant had "no significant problems at this time."

On November 14, 2014, the claimant again saw Dr. Ally, who reported that he was doing well with no complaints, was stable, his medications were helping, and he had no new concerns.[96]

Mr. Plaisance was again seen in the internal medicine clinic at UMC on January 6, 2015.[97]  He complained of back pain and requested refills of Tramadol.

---

[95]    Rec. Doc. 12-3 at 521.

[96]    Rec. Doc. 12-3 at 520.

[97]    Rec. Doc. 12-3 at 327-364.

His prescriptions were Fluticasone nasal spray, Metformin, and Tramadol.  The doctor's impressions included type II diabetes, hypertension, back pain, and bipolar disease.

The claimant followed up in the internal medicine clinic on March 10, 2015.[98] The conditions that were evaluated were diabetes, hypertension, bipolar illness, and back pain.  His Tramadol prescription was refilled.  It was noted that all of these conditions were controlled with his current medications.[99]

Mr. Plaisance followed up with Dr. Ally at the Tyler Clinic on May 15, 2015.[100]  He was doing "rather well" with no new problems, concerns, or issues.

When Mr. Plaisance returned to the UMC emergency room on June 8, 2015,[101] he reported that he was nervous and had been waking up with the shakes for the past month.  He also complained of bilateral foot pain.  He was diagnosed with anxiety, as well as with peripheral neuropathy, fungal dermatitis, and foot pain and swelling. He was prescribed Lamisil and Gabepentin.  His Metformin, Losartan, and Tramadol prescriptions were continued.

---

[98]    Rec. Doc. 12-3 at 99-105.

[99]    Rec. Doc. 12-3 at 190-192

[100]    Rec. Doc. 12-3 at 940.

[101]    Rec. Doc. 12-3 at 289-320.

When Mr. Plaisance followed up in the internal medicine clinic at UMC on June 10, 2015,[102] he requested an HIV test.  The diagnoses assigned were hyperlipidemia, polycythemia, hypertension, and diabetes.  He returned to the clinic on June 25, 2015 and asked that the doctor be advised that, although he had been taking nerve medicine for two months, he was still nervous and jumpy.[103]

The claimant presented at UMC's emergency room on July 14, 2015,[104] complaining of abdominal pain, vomiting, and diarrhea for the past week.  He was diagnosed with gastroenteritis.  It was also noted that he had hyperlipidemia, hypertension, diabetes, and bipolar disorder, all of which were described without explanation as "resolved."

Mr. Plaisance returned to the internal medicine clinic at UMC on August 20, 2015,[105] complaining about lower back pain and mid lower abdominal pain that was not responding to pain medication.  His "present illnesses" were listed as diabetes, hypertension, hyperlipidemia, and bipolar disorder.   Levsin was prescribed for abdominal cramps, and he was still taking Metformin, Gabapentin, Lovastatin, and Losartan.

---

[102]    Rec. Doc. 12-3 at 108-113, 118-121, 125-143.

[103]    Rec. Doc. 12-3 at 148.

[104]    Rec. Doc. 12-3 at 229-269.

[105]    Rec. Doc. 12-3 at 201-228.

On September 8, 2015,[106] Mr. Plaisance presented at the UMC emergency room.  He stated that he was feeling depressed and having suicidal ideation.  His mother had brought him in because he was a threat to himself and others, was exhibiting aggressive behavior, was verbally abusive, and was possibly noncompliant with his medications.  It was noted that he presented with depression and anxiety and that his symptoms were worsening.  No evidence was found in the record concerning how long Mr. Plaisance was hospitalized or documenting the treatment he received during his hospitalization.

On October 14, 2015, the claimant again testified at a hearing.[107]  He complained about back and foot pain, stated that he takes medication for diabetes, sometimes gets dizzy, takes medication for hypertension, and takes medication for a bipolar condition.  He also stated that he had hernia surgery.  He testified that he occasionally sees faces laughing at him.  Although he reads the newspaper some days, he has trouble remembering what he reads.  The claimant's mother, Laura Plaisance, also testified at the hearing.  She described the claimant's rapid mood changes and stated that he is sometimes verbally abusive.  She stated that she had recently had the claimant hospitalized so that his mental illness could be evaluated.

---

[106]    Rec. Doc. 12-3 at 490-493.

[107]    Rec. Doc. 12-2 at 511-575.

She corroborated the claimant's complaints of back pain.  A vocational expert also testified at the hearing.

On October 16, 2015, the claimant met again with Dr. Ally at the Tyler Clinic.[108]  Dr. Ally noted that Mr. Plaisance was doing "fairly well" but complained about Seroquel making him drowsy.  The dosage was adjusted.  The treatment note contains no mention of Mr. Plaisance's recent hospitalization for psychiatric issues.

When Mr. Plaisance returned to see Dr. Ally on November 13, 2015,[109] he reported that he was fighting with his mother and brother, he accused them of stealing his medications, and he reported that his mother wanted to evict him.  He also said that his medications were helpful.

Mr. Plaisance met with Dr. Ally again on February 12, 2016.[110]  He reported conflict with his mother and brother and was seeking to move into his own home. He stated that his medications were helpful and caused no side effects.  Dr. Ally described him as stable.  His medications were continued.  The diagnosis assigned was Bipolar disorder, current episode depressed, severe, with psychotic features.

---

[108]    Rec. Doc. 12-3 at 939.

[109]    Rec. Doc. 12-3 at 938.

[110]    Rec. Doc. 12-3 at 885-891.

The claimant again saw Dr. Ally at the Tyler Clinic on August 2, 2016.[111]  He was described as stable on his current medications but he complained of being a little more fatigued lately.  His mood was euthymic, his judgment and insight were fair.  No hallucinations were noted.  His medications were continued.  His diagnosis remained the same.

Mr. Plaisance met with Dr. Ally again on January 24, 2017.[112]  He reported that he was stable, doing well, and had no new complaints.  He indicated that his current medications were effective and had no side effects.  Dr. Ally noted a euthymic mood, appropriate affect, and logical, coherent, goal-directed thought processes.  No hallucinations were noted.  He found that Mr. Plaisance's judgment and insight were fair and his memory was intact.  His medications were continued, and he was to return to see Dr. Ally in six months.

Mr. Plaisance again saw Dr. Ally on June 13, 2017.[113]  He complained of visual changes and leg pains that Dr. Ally believed to be peripheral neuropathy.  Dr. Ally encouraged him to discuss this with his primary care physician.  Otherwise, he was "doing well."  His medications were renewed, and he was to return in six months.

---

[111]     Rec. Doc. 12-3 at 892-897.

[112]     Rec. Doc. 12-3 at 898-904.

[113]     Rec. Doc. 12-3 at 905-911.

The claimant testified at a third hearing on July 12, 2017.[114]  He testified that he can walk and stand for about fifteen to twenty minutes at a time and can sit for about half an hour before his low back starts to hurt.  He stated that he can lift about twenty-five pounds.  He confirmed that he was receiving mental health treatment at the Tyler Clinic and had also been treated for mental health issues at UMC.  He stated that he had problems with his memory, cannot tolerate crowds or strangers, did a small amount of housework, and did a little shopping but always with others.  He listed seven prescription medications that he was taking.   Despite taking medication for his mental illness, he stated that he still suffered with anxiety, panic attacks, depression, and auditory and visual hallucinations.  He stated that he drove rarely and never by himself because he got nervous while driving and sometimes forgot where he was going.  He stated that his medications made him drowsy during the day.  He explained that he read the sports section of the newspaper but forgot what he read after about thirty minutes.  He no longer attended church or went out with friends.  He did not feel safe anywhere except at home.  He did not believe he could live on his own.  He also explained that he had diabetes and hypertension.  He stated that the diabetes caused foot and leg pain and prevented him from standing

---

[114]     Rec. Doc. 12-3 at 578-605.

for long periods of time. The claimant's mother, Laura Plaisance, testified at the hearing and confirmed the claimant's testimony. A vocational expert also testified.

On July 17, 2017, the claimant was again examined by Dr. Buxton.[115] Dr. Buxton did not review the entire record; instead, he reviewed only Exhibit 20F, consisting of treatment records from the Tyler Clinic from September 2012 to August 2015. Mr. Plaisance told Dr. Buxton that he had Type II diabetes, high blood pressure, high cholesterol, acid reflux, episodic low back pain that he attributed to a workplace injury from "years ago," and two psychiatric inpatient stays "years back." He told Dr. Buxton that he was taking seven prescription medications, three of which were psychoactive: Buspar, Seroquel, and Paxil. Dr. Buxton diagnosed him with Bipolar Affective Disorder, with fair response to psychoactive medication, and complaints of chronic pain. Dr. Buxton advised that continued outpatient mental health intervention in the form of medication and counseling "may be of benefit." He assigned a GAF score of 55-60 over the preceding twelve months. Dr. Buxton found that Mr. Plaisance was usually more sad than happy, had episodic crying spells, was a chronic worrier, and was episodically upset with a tendency to fuss. He had occasional dizziness, blurred vision, and chest tightness associated with

---

[115] Dr. Buxton's report and medical source statement are in the record at Rec. Doc. 12-3 at 870-873, 877-879. This Court finds it curious that Dr. Buxton's license to practice clinical psychology expired on June 30, 2017, approximately two weeks before he examined Mr. Plaisance. Rec. Doc. 12-3 at 877. The record does not contain any information regarding whether Dr. Buxton's license was subsequently renewed.

increased anxiety.  His mood was somewhat flat with a bland affect.  His reasoning and insight were fair, judgment and reflective cognitions were good, pace was even, and his ability to attend and concentrate were good.  However, Mr. Plaisance also described occasional indiscriminate auditory hallucinations that are chronic in nature.  Dr. Buxton opined that "[w]ith adequate intrinsic motivation and an emphasis on performing tasks that would not aggrate [sic] his pain complaints then perhaps at a minimally adequate level he would be able to respond in a reliable and dependable fashion as an employee. . . [and] tolerate the frustration and stress he would encounter in the job setting."  Dr. Buxton's medical source statement indicated that Mr. Plaisance has moderate impairments in most categories evaluated, meaning that "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily."

## **Analysis**

### A.    **Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[116]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant

---

[116]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

evidence as a reasonable mind might accept as adequate to support a conclusion."[117] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[118]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[119]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[120]  Conflicts in the evidence[121] and credibility assessments[122] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:   (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[123]

---

[117]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[118]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[119]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[120]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[121]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[122]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[123]    *Wren v. Sullivan*, 925 F.2d at 126.

## B.    <u>Entitlement to Benefits</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[124]  The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[125]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[126]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[127]

---

[124]    See 42 U.S.C. § 423(a).

[125]    42 U.S.C. § 1382(a)(1) & (2).

[126]    42 U.S.C. § 1382c(a)(3)(A).

[127]    42 U.S.C. § 1382c(a)(3)(B).

## C.    <u>Evaluation Process and Burden of Proof</u>

A sequential five-step inquiry is used to determine whether a claimant is disabled.  This process requires the Commissioner to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[128]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[129] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[130]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[131]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can

---

[128]    20 C.F.R. § 404.1520.

[129]    20 C.F.R. § 404.1520(a)(4).

[130]    20 C.F.R. § 404.1545(a)(1).

[131]    20 C.F.R. § 404.1520(e).

43

perform other substantial work in the national economy.[132]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[133]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[134]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[135]

## D.    The ALJ's Findings and Conclusions

At step one of the analysis, the ALJ made two irreconcilable findings.  First, the ALJ found that the claimant had not engaged in substantial gainful activity since October 15, 2006, the alleged disability onset date.[136]  Then the ALJ stated that the claimant engaged in work that "was above the presumptive substantial gainful activity wage level through April 2009."[137]  This Court finds that substantial evidence in the record supports the ALJ's latter statement but not the former.  The

---

[132]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[133]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[134]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[135]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[136]    Rec. Doc. 12-3 at 561.

[137]    Rec. Doc. 12-3 at 561.

earnings amounts set out in the regulations create a rebuttable presumption of SGA.[138]  The substantial gainful activity amounts for 2007 and 2008 were $940 per month and $980 per month, respectively.[139]  If a person earns more than these amounts, he is not considered disabled.  Evidence in the record shows that Mr. Plaisance's earnings exceeded those levels in 2007 and 2008.

At step two, ALJ Fields found that the claimant's only severe impairment is bipolar disorder.[140]  Substantial evidence in the record supports the conclusion that Mr. Plaisance's bipolar disorder is severe.  However, this finding is incompatible with ALJ Wahlder's finding that the claimant's hypertension is also severe.  This Court found that ALJ Wahlder's finding in that regard was supported by substantial evidence in the record.[141]  ALJ Fields's finding at step two is also incompatible with ALJ Gattuso's finding that that the claimant's diabetes, obesity, and hypertensive vascular disease were also severe impairments.  Furthermore, the claimant challenged ALJ Fields's step two finding.

---

[138]    *White v. Heckler*, 740 F.2d 390, 394 (5th Cir.1984).

[139]    Social Security, https://www.ssa.gov/oact/cola/sga.html (last viewed April 29, 2019).

[140]    Rec. Doc. 12-3 at 562.

[141]    Rec. Doc. 12-2 at 606.

At step three, ALJ Fields found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[142]  The claimant challenged this finding.

The ALJ found that the claimant has the residual functional capacity to perform a full range of work at all exertional levels with certain nonexertional limitations.[143]  In arguing that he is disabled, the claimant challenged this finding.

At step four, the ALJ found that the claimant is capable of performing his past relevant work as a dishwasher.[144]  This finding is incompatible with the findings of ALJ Wahlder and ALJ Gattuso, both of whom found that the claimant was unable to perform his past relevant work.[145]

At step five, the ALJ found that the claimant was not disabled from October 15, 2006 through November 15, 2017 (the date of the decision) because there are jobs in the national economy that he can perform.  The claimant challenged this finding.

---

[142]    Rec. Doc. 12-3 at 564.

[143]    Rec. Doc. 12-3 at 564.

[144]    Rec. Doc. 12-3 at 569.

[145]    Rec. Doc. 12-2 at 587; Rec. Doc. 12-2 at 503.

**E.**    **The Allegations of Error**

The claimant contends that the ALJ erred (1) in evaluating only Mr. Plaisance's bipolar disorder and in finding that it has only a moderate effect on his functional ability; and (2) failing to determine whether the combination of Mr. Plaisance's bipolar disorder and his other impairments meets or medically equals a listing.

**F.**    **The ALJ's Evaluation of the Claimant's Bipolar Disorder**

The claimant's argument concerning his bipolar disorder conflated the requisite analysis for two steps of the sequential analysis, arguing that the ALJ erred in failing to find that his bipolar disorder was severe, in finding that his bipolar disorder had only a moderate effect, and in failing to find that his bipolar disorder did not meet a listing.  At step two of the analysis, the ALJ is charged with determining whether any of the claimant's physical or mental impairments are severe.  The Fifth Circuit has formulated the proper standard to use in evaluating the severity of an impairment as follows:  "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."[146]  In this case, the ALJ applied

---

[146]    *Stone v. Heckler*, 752 F.2d 1099, 1051 (5th Cir. 1985).

47

that standard and, in the section of the decision addressing the claimant's residual functional capacity, the ALJ employed the "special technique" for evaluating the severity of mental impairments.  He expressly found that the claimant's bipolar disorder is severe.[147]

The claimant also couched his argument in terms of step three of the sequential analysis, contending that "the ALJ erred in failing to find that Mr. Plaisance's bipolar disorder. . . is a severe impairment that meets the Listing level criteria. . . [of] 12.04(3)(B) or (C)."[148]  Listing 12.04 is the listing for depressive disorders.  In his decision, the ALJ stated that he "specifically considered" whether the claimant's condition met the requirements of Listing 12.00 for mental impairments, but the ALJ did not state which of the specific listings in section 12.00 he considered nor did he compare the claimant's symptoms or medical findings against the criteria for any listing.  This was error.

"[T]he ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[149]  More particularly, "[t]he ALJ should identify the listed impairment for which the

---

[147]     Rec. Doc. 12-3 at 562.

[148]     Rec. Doc. 13 at 2-3.

[149]     *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).

claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment."[150]  Accordingly, the ALJ's analysis at step three was incomplete.

In *Audler v. Astrue*, the ALJ concluded that the medical evidence in the record indicated that the claimant had impairments that were severe but did not meet or medically equal a listed impairment.  The Fifth Circuit Court of Appeals noted that "[t]he ALJ did not identify the listed impairment for which Audler's symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that Audler's symptoms are insufficiently severe to meet any listed impairment."[151] The Fifth Circuit concluded that "[s]uch a bare conclusion is beyond meaningful judicial review."[152]  The court then went on to explain that:

> By the explicit terms of the statute [42 U.S.C. § 405(b)(1)], the ALJ was required to discuss the evidence offered in support of Audler's claim for disability and to explain why she found Audler not to be disabled at that step.  Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step and because she did not, "we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."[153]

---

[150]    *Savoie v. Colvin*, No. 14-30-JJB-RLB, 2015 WL 1004217, at *5 (M.D. La. Mar. 5, 2015).

[151]    *Audler v. Astrue*, 501 F.3d at 448.

[152]    *Audler v. Astrue,* 501 F.3d at 448 (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)).

[153]    *Audler v. Astrue*, 501 F.3d at 448 (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).

In this case, as in *Audler*, the ALJ failed to follow the Fifth Circuit's guidelines for evaluating the claimant's impairments, summarily stating only that "evidentiary deficiencies preclude a finding of listing level impairment."[154]   In accordance with the Fifth Circuit's reasoning, the ALJ's step three determination in this case was not reached through the application of proper legal standards, and the undersigned is unable to determine whether the ALJ's conclusion at step three is based on substantial evidence in the record.  Because the ALJ failed to compare the claimant's symptoms with those of any listings that might be relevant, the ALJ's decision should be reversed.[155]

## G.    The ALJ's Evaluation of the Combination of Impairments

The claimant argued that the ALJ erred in failing to properly evaluate the combination of the claimant's impairments.  The first ALJ who considered this case found that the claimant had only one severe impairment:  hypertension.  This Court found that there was substantial evidence in the record supporting that finding,[156] but

---

[154]      Rec. Doc. 12-3 at 564.

[155]      See, e.g., *Reyna v. Colvin*, No. 5:14-CV-147-C, 2015 WL 1515251, at *4 (N.D. Tex. Apr. 1, 2015); *Marsh v. Comm'r of Soc. Sec. Admin*., No. 4:13CV312, 2015 WL 1288656, at *3 (E.D. Tex. Mar. 20, 2015) *Watson v. Colvin*, No. 3:13-CV-583-BF, 2014 WL 1281473, at *4 (N.D. Tex. Mar. 31, 2014); *Joseph v. Astrue*, No. 6:10-CV-01315, 2012 WL 601477, at *6 n. 74 (W.D. La. Jan. 24, 2012) report and recommendation adopted, No. 6:10-CV-01315, 2012 WL 601586 (W.D. La. Feb. 22, 2012); *Robertson v. Astrue*, No. 3-10-CV-1669-BD, 2011 WL 3836915, at *4 (N.D. Tex. Aug. 26, 2011); *Lynch v. Astrue*, No. 7–10–CV–0032–BD, 2011 WL 1542056 at *3–4 (N.D.Tex. Apr. 22, 2011).

[156]      Rec. Doc. 12-2 at 606.

also found that the ALJ erred in failing to find that the claimant's bipolar disorder was severe. This Court also found that the ALJ failed to properly analyze whether the two impairments, either singly or in combination, met or equaled a listed impairment. The matter was remanded with specific instructions to address that issue.[157]

In the ruling currently under review, however, the ALJ did not find that the claimant's hypertension was a severe impairment. But the evidence in the record did not change. Thus, the ALJ's finding that the claimant's hypertension is not severe is not supported by substantial evidence in the record. Further, by failing to find that the claimant's hypertension was severe, the ALJ again erred in failing to consider whether the claimant's bipolar disorder and hypertension – in combination – meet or equal a listing or had a significant impact on the claimant's functionality. The ALJ's error in evaluating the severity of the claimant's impairments and his failure to comply with the instructions to the Commissioner on remand mandates reversal of the ALJ's decision.

## H.    The ALJ's Evaluation of Residual Functional Capacity

Although the claimant did not expressly allege that the ALJ erred in evaluating residual functional capacity, the claimant did object to the ALJ's characterization of

---

[157]    Rec. Doc. 12-2 at 599.

51

the functional impact of his bipolar disorder as "moderate." To the extent necessary, this Court is compelled to raise the ALJ's evaluation of the claimant's residual functional capacity on its own.[1]

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[158] The ALJ is responsible for determining a claimant's residual functional capacity.[159] In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[160] The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ

---

[1]    See, e.g., *Watson as Next Friend of N.L.K. v. Commissioner of Social Security*, No. 1:17cv00099-JMV, 2018 WL 4689459, at *2-3 (N.D. Miss. Sept. 28, 2018); *Benson v. Commissioner of the Social Sec. Admin*., 2004 WL 3237348, at *3 (E.D. Tex. 2004); *Womack v. Astrue*, No. CIV-01-167-W, 2008 WL 2486524, at *5 (W.D. Okla. June 19, 2008) ("this Court cannot. . . ignore obvious and prejudicial errors, even if the litigants did not identify and debate them."). The Fifth Circuit has stated that a "reviewing court may not abdicate its traditional judicial function, nor escape its duty to scrutinize the record as a whole to determine whether the conclusions reached are reasonable, and whether the hearing examiner applied correct legal standards to the evidence." *Bridges v. Gardner*, 368 F.2d 86, 90 (5th Cir. 1966) (citations omitted). Furthermore, the United States Supreme Court has held that a claimant need not exhaust issues in a request for review to the Appeals Council in order to preserve his right to judicial review of those issues. *Sims v. Apfel*, 530 U.S. 103, 112 (2000).

[158]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[159]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[160]    *Martinez v. Chater*, 64 F.3d at 176.

who has had an opportunity to observe whether the person seems to be disabled.[161] In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[162]

In this case, however, the ALJ considered only the claimant's mental health impairment in evaluating his residual functional capacity and did not even mention any other impairments in the six pages of the ruling that were devoted to an analysis of the claimant's residual functional capacity. This was error, and it was not harmless error. There is evidence in the record that the claimant has hypertension, episodic bilateral pedal edema, and diabetic neuropathy in his lower extremities as well as chronic back pain attributable to a work place accident and chronic foot and leg pain originating in childhood. The ALJ's failure to even mention these conditions when evaluating the claimant's residual functional capacity demonstrates that the ALJ failed to apply the proper legal standard and failed to determine whether substantial evidence in the record supports his residual functional capacity finding.

---

[161]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

[162]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

Furthermore, in evaluating the claimant's residual functional capacity, the ALJ expressly relied upon the conclusions of the DDS psychological consultant's assessment that the claimant's mental impairments were not severe, giving that opinion great weight even while acknowledging that the consultant's opinions "do not appear to have been consistent with the weight of the evidence. . . and . . . did not account for subsequent evidence."[163]   The ALJ did not discuss Dr. Buxton's statement regarding the claimant's ability to work.  Even if he had, however, Dr. Buxton's opinions in that regard were based solely on his evaluation of information concerning the claimant's mental health and did not factor in any medical information concerning the claimant's other impairments for the simple reason that the only treatment notes and medical evidence that Dr. Buxton reviewed had to do with mental health treatment.  Consequently, the ALJ's finding with regard to the claimant's residual functional capacity was not supported by substantial evidence in the record.

Additionally, this Court cannot avoid noticing the skewed manner in which the ALJ presented the evidence concerning the claimant's bipolar disorder that was discussed in the section of the ruling concerning residual functional capacity.

---

[163]    Rec. Doc. 12-3 at 567-568.

First, the ALJ referred to evidence in the record regarding the claimant's social activities and cast all such references in a positive light. The ALJ did not mention the claimant's fights with his mother and brother, the fact that he only drove when accompanied, his report to his social worker/therapist that his mother was his caretaker and assisted with his activities of daily living, his report that he stopped going to church, stopped seeing friends, and argued with the people that he formerly played cards with. None of the negative information that the claimant relayed to his physicians or therapists was mentioned by the ALJ in his ruling. Therefore, this Court is not convinced that the conclusions reached by the ALJ were supported by substantial evidence.

Second, the ALJ misinterpreted Dr. Diggs's evaluation of the claimant's mental health status on March 3, 2011. The ALJ erred in attributing the evaluation to Dr. Tyler rather than Dr. Diggs. Dr. Diggs is a psychiatrist at the Dr. Joseph Henry Tyler Behavioral Health Center. The ALJ then stated that the evaluation revealed that "the claimant's mental status examination was fairly normal except for a depressed mood and constricted affect," which was a gross mischaracterization of Dr. Diggs's findings. Dr. Diggs found that the claimant's affect was constricted and intense; his mood was depressed, anxious, and angry; his thought process was slow, his speech was monotonous; his thought content contained persecutory delusions; he experienced auditory and visual hallucinations; his intelligence was borderline;

55

his insight and judgment were impaired; and he was incapable of abstractions. Dr. Diggs further found that the claimant had decreased energy, slowed thoughts, and impaired cognition.  Dr. Diggs diagnosed the claimant with bipolar affective disorder with psychosis and alcohol abuse in remission, and he assigned a GAF score of 35, which signifies an inability to function in almost all areas.

Third, the ALJ attributed the claimant's weight gain following the initiation of psychotropic medications to his sweet tooth rather than recognizing it as a side effect of the medications he was prescribed by Dr. Diggs.

Fourth, the ALJ suggested that the claimant's mental health symptoms were attributable to his failure to comply with the prescribed medication regimen.  The ALJ stated that "[t]reatment notes dated in September 2015 indicated that the claimant was depressed with aggressive behavior and suicidal ideations.  However, *once again*, he was not taking his medications."[164]   Nowhere in the preceding discussion of the claimant's residual functional capacity had the ALJ noted a lack of compliance with medication.  In support of that statement, the ALJ cited pages in the record that mentioned a "possible non-compliance with medications"[165] not a confirmed noncompliance with medication and certainly not a recurrent noncompliance with medication.

---

[164]     Rec. Doc. 12-3 at 566 (emphasis added).

[165]     Rec. Doc. 12-3 at 490.

This Court did locate two references in the record to the claimant having been noncompliant with medications.  On one of the two occasions, the claimant stated that he was noncompliant because he was unable to afford his medications.  The Social Security regulations impose an affirmative duty upon claimants to follow the treatment prescribed by their physicians,[166] and a condition that can reasonably be remedied by surgery, treatment, or medications is not disabling.[167]  But a claimant's failure to follow prescribed medical treatment will preclude an award of benefits only if the claimant lacks a good reason for failing to comply.[168]  One such "good reason" is an inability to pay for the recommended treatment.[169]  "[T]he medicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered."[170]  Furthermore, aside from the incident in 2015 mentioned by the ALJ in his ruling, there is no evidence that the claimant failed to take the medications prescribed by Dr. Diggs and Dr. Ally at the Tyler Clinic after he sought treatment there in 2011.

---

[166]     20 C.F.R. §§ 404.1530, 416.930.

[167]     *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

[168]     20 C.F.R. § 416.930; *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990).

[169]     SSR 16-3p, 2016 WL 1119029, at *8-9.  *Villa v. Sullivan*, 895 F.2d at 1024 ("although a condition that can be remedied by treatment is not disabling, a person unable to afford such treatment is considered disabled.").

[170]     *Lovelace v. Bowen*, 813 F.2d at 59.

At a later point in the ALJ's discussion of the claimant's residual functional capacity, he again referred to "frequent instances of medication non-compliance"[171] and cited two pages in the record to support that statement.  But neither cited page mentions anything about the claimant's compliance with prescribed medication.  Thus, the ALJ's contention that the claimant's psychiatric symptoms were the result of a failure to comply with prescribed medication is not supported by evidence in the record.

Fifth, the ALJ questioned the claimant's credibility with regard to the frequency of treatment he received at the Tyler Clinic, pointing out "months-long gaps in treatment" despite the claimant's hearing testimony that he was seen monthly.[172]  What the claimant actually said in his hearing testimony was "I go over there once a month for my medicine."[173]  The record shows that the claimant was seen monthly in 2011 and 2012 by either a psychiatrist, a social worker, or both and that the doctor and therapist changed the schedule so that sessions were spaced farther apart, mentioning this in the treatment notes.  Once Dr. Ally took over management of the claimant's treatment, no additional counseling sessions with social workers were scheduled.  This change in treatment approach is not explained

---

[171]    Rec. Doc. 12-3 at 567.

[172]    Rec. Doc. 12-3 at 567.

[173]    Rec. Doc. 12-2 at 523.

in the record.  Additionally, there is evidence that the claimant would go to the Tyler Clinic every month to pick up his medications – even if he did not have a therapy or psychiatrist's appointment.[174]  There is evidence of only one scheduled appointment at the Tyler Center for which the claimant did not show up.[175]  Thus, any "gap in treatment" at the Tyler Center was due to a change in the treatment plan and not the result of the claimant deliberately failing to avail himself of services.

Sixth, in addressing the incident in September 2015 when the claimant's mother had him involuntarily hospitalized for a psychiatric evaluation, the ALJ noted that "there is no other similar event seen in the evidence either before or since."[176]  That statement is incorrect.  The claimant was hospitalized for a psychological evaluation on December 5, 2011 after having been away from home for a few days and believing that he was pregnant.  The claimant also gave a history of having been hospitalized for psychiatric reasons approximately ten years before he applied for benefits.  The incident in 2015 is the claimant's third documented psychiatric hospitalization.

---

[174]    Rec. Doc. 12-3 at 913-932 (evidencing medication picked up on twenty dates in twenty consecutive months between December 2015 and May 2017).

[175]    Rec. Doc. 12-3 at 528.

[176]    Rec. Doc. 12-3 at 567.

Seventh, the ALJ noted that the record contains multiple assignments of GAF scores, and stated that the "scores ranged from 55-60, which denote no worse than moderate symptomatology and impairment in social, occupational[,] and other areas of functioning."[177]   The ALJ expressly stated that he considered the GAF scores along with other evidence to support his conclusion regarding the claimant's overall level of functioning.  For that reason, he gave those scores "significant evidentiary weight."[178]  The ALJ failed to note, however, that Dr. Diggs, the claimant's treating psychiatrist, assigned a GAF score of 35 on March 3, 2011 and assigned GAF scores of 53 on August 1, 2012, February 18, 2013, April 17, 2013, and June 20, 2013. Apparently, the ALJ did not figure those scores into his analysis of the claimant's functionality.  Thus, the ALJ apparently ignored the lower scores and based his evaluation of the claimant's functionality only on the higher scores.

The Fifth Circuit has instructed that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."[179]   But the seven points identified here illustrate that this ALJ, in evaluating the claimant's residual functional capacity, focused solely on the evidence in the record that supported a conclusion that the claimant was not disabled

---

[177]    Rec. Doc. 12-3 at 569.

[178]    Rec. Doc. 12-3 at 569.

[179]    *Loza v. Apfel*, 219 F.3d at 393.

and failed to mention or analyze any evidence that might support a contrary conclusion. This was error, and it requires this Court to find, first, that the ALJ failed to apply the proper legal standard and, second, that the ALJ's conclusion that the claimant retains the residual functional capacity to perform a full range of work at all exertional levels (with some identified nonexertional limitations) was not supported by substantial evidence in the record. The ALJ's errors in evaluating the claimant's residual functional capacity mandates reversal of the Commissioner's decision.

## I.     <u>Futility</u>

The Commissioner has already had three opportunities to fairly evaluate the claimant's applications for benefits and failed to do so. The Commissioner has had two opportunities to correct the errors that occurred in connection with the first ALJ's ruling. Two subsequent ALJs committed errors that were at least as egregious as those of the first ALJ. The factual record needs no further development, and more administrative proceedings, or another hearing, would serve no useful purpose and would result in further delay[180] of this case that began almost ten years ago, in

---

[180]     See *Steficek v. Barnhart*, 462 F.Supp.2d 415, 421-22 (W.D. N.Y. 2006), and the cases cited there. See, also, *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992); *Pena v. Colvin*, No. 5:14-CV-016-C, 2015 WL 738255, at *4 (N.D. Tex. Feb. 20, 2015); *Roy v. U.S. Com'r of Social Sec.*, No. 2:11-CV-01594, 2012 WL 2863209, at *12 n. 6 (W.D. La. May 23, 2012), report and recommendation adopted, 2012 WL 2863205 (W.D. La. July 11, 2012) (citing *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006), for the proposition that "Courts direct the Commissioner to award benefits without further rehearing when uncontroverted evidence clearly establishes that

November 2010.  Accordingly, it is recommended that the Commissioner's ruling be reversed and benefits awarded.

## Conclusion and Recommendation

Accordingly, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions that the claimant's applications for Disability Insurance Benefits and Supplemental Security Income be granted and for computation and payment of an award of benefits for the time period beginning on April 21, 2009.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by

---

claimants are entitled to relief, or when additional fact-finding will serve no useful purpose."); *Moree v. Astrue*, No. 7:10-CV-0006-BF, 2011 WL 1252904, at *9 (N.D. Tex. Apr. 1, 2011).

Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[181]

     Signed in Lafayette, Louisiana, this 13th day of May 2019.

                              _____

                                PATRICK J. HANNA
                                UNITED STATES MAGISTRATE JUDGE

---

[181]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).